# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TELFORD BOROUGH AUTHORITY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION NO.:** |
| v. | : | |
| | : | |
| **UNITED STATES ENVIRONMENTAL** | : | 2:12-CV-6548 |
| **PROTECTION AGENCY, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM

**Judge C. Darnell Jones, II**                                                                                          **November 15, 2013**

Pending before the court is a motion to dismiss filed by all named defendants seeking dismissal of Counts I and IV of the complaint on the grounds that plaintiff has not alleged that the Environmental Protection Agency (EPA) failed to perform a non-discretionary duty (Count I) and there has been no final agency decision as to plaintiff's reconsideration request (Count IV). (Doc. No. 12.) Plaintiff responds by arguing that the EPA failed to follow proper administrative procedures and that such a failure constitutes a non-discretionary duty for which plaintiff may seek relief under 33 U.S.C. §1365(a)(2). (Doc. No. 13.) Plaintiff further contends that its informal communications with the EPA, a privilege log produced in response to a FOIA request, and an affidavit by the manager for the Telford Borough Authority all conclusively establish that there has been final EPA action on the reconsideration request. (Doc. No. 13.) In light of the following discussion, and, after thoroughly reviewing the parties' briefs and exhibits, the court will **GRANT** the motion **IN PART** and **DENY IN PART**. The court will **GRANT** the motion to dismiss as it relates to **COUNT I.** Furthermore, the court will **DENY** the motion to dismiss **WITHOUT PREJUDICE** at it relates to **COUNT IV**. Finally, the court will **GRANT** the parties **LEAVE TO ENGAGE IN LIMITED**

**DISCOVERY** on the issue of subject matter jurisdiction.

## BACKGROUND

This dispute arises out of a disagreement between the Telford Borough Authority, a Pennsylvania municipality, and the EPA over the Indian Creek Watershed total maximum daily load ("TMDL"), a document setting limits for pollutant discharge into the Indian Creek waterway. Telford owns and operates a publicly owned treatment works that is located within the boundaries of the Indian Creek Watershed. (Doc. No. 1, at 3.) EPA Region 3 is responsible for administering and implementing the Clean Water Act (CWA) in Pennsylvania. *EPA Region 3 (Mid-Atlantic)*, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY (Nov. 1, 2013), http://www2.epa.gov/aboutepa/epa-region-3-mid-atlantic. Defendant Lisa Jackson is the Administrator of the EPA, and Shawn Garvin is the agency's Region 3 Administrator. (Doc. No. 1, at 4.)

By way of relevant background, Congress passed the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" and to maintain "water quality which provides for the protection and propagation of fish, shellfish, and wildlife." 33 U.S.C. §1251(a) & (a)(2). In light of these goals, the CWA envisions cooperation between the EPA and state environmental agencies. American Farm Bureau Federation v. U.S. E.P.A.,--- F.Supp.2d ----, 2013 WL 5177530, *2 (M.D.Pa. Sept. 13, 2013) (explaining that CWA "demand[s] cooperative federalism"). In Pennsylvania, the Department of Environmental Protection ("DEP") is primarily responsible for environmental regulation and, more pertinent for purposes of this case, water quality regulation. Raymond Proffitt Foundation v. U.S. E.P.A., 930 F.Supp. 1088, 1092 n. 4 (E.D.Pa. 1996) (documenting history of DEP).

Section 1313(a) of the CWA requires states to establish water quality standards ("WQSs"),

which "designate[] uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." 33 U.S.C. §1313(a) (states to complete WQSs); 33 U.S.C. §1313(c)(2)(A) (defining WQSs). WQSs can take the form of numeric standards, which utilize numeric or quantitative parameters, and narrative standards, which "express a parameter in a qualitative form."[1] *Basic Course: Key Concepts (Module 3.e), Forms of Expression: Numeric and Narrative Criteria*, ENVIRONMENTAL PROTECTION AGENCY (March 6, 2012), http://water.epa.gov/ learn/training/standardsacademy/mod3/page6.cfm. The EPA may revise a state-created WQS if it determines that the "current standard is inconsistent with the CWA" but only after the agency formally notifies the state of the discrepancy. 33 U.S.C. §§1313(b)(1) & (c)(4) (EPA may revise WQS if state's proposal is not consistent with CWA); 40 C.F.R. §131.5 (in deciding to disapprove state WQS, EPA should determine whether it is consistent with requirements of CWA). The formal notification period gives the state 90 days to bring its WQS into compliance with the CWA before the EPA may revise the WQS itself. 40 C.F.R. §131.21 (setting forth 90 day period); 40 C.F.R.

---

[1]The EPA gives the following example of the differences between the two types of criteria:

Numeric Criteria

For the Protection of human health against the ingestion of contaminated water and contaminated aquatic organisms: the ambient water quality criterion for cadmium is recommended to be identical to the existing drinking water standard, which is 10μg/L (micrograms per liter).

Narrative Criteria

For the protection from various oils in water bodies: surface waters shall be virtually free from floating non-petroleum oils of vegetable or animal origin, as well as petroleum-derived oils. *Basic Course: Key Concepts (Module 3.e), Forms of Expression: Numeric and Narrative Criteria*, ENVIRONMENTAL PROTECTION AGENCY (March 6, 2012), http://water.epa.gov/learn/training /standardsacademy/mod3/page6.cfm

§131.22 (same). Once the 90-day period had passed, the EPA may revise the WQS pursuant to notice-and-comment rulemaking.[2] 5 U.S.C. §553 (setting forth notice-and-comment requirement of the Administrative Procedure Act).

Once a WQS has been implemented, it is used as a baseline to measure the health of the water bodies for which it was developed. If a body of water does not meet the standard set forth in the applicable WQS, it is designated "impaired" and added to a list of impaired waters known as the "303(d) list." 33 U.S.C. §1313(d). Once it is so designated, the CWA requires the state to draft a total maximum daily load ("TMDL"). 33 U.S.C. §1313(d)(1)(C). A TMDL "calculat[es] the amount of . . . pollutant an impaired water body can naturally absorb and remain unimpaired." *West Goshen Sewer Authority v. U.S. E.P.A.*, 12-CV-5353, 2013 WL 3914481, *1 (E.D.Pa. July 30, 2013); 33 U.S.C. §1313(d)(1)(C). More specifically, a TMDL must "be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." 33 U.S.C. §1313(d)(1)(C).

If the EPA administrator disapproves of the state TMDL, the EPA may establish its own TMDL or revise the state TMDL but must follow notice-and-comment rulemaking provisions of the Administrative Procedure Act ("APA") in doing so. 33 U.S.C. 1313(d)(2); 5 U.S.C. §553. The TMDLs themselves are not self executing but are implemented through National Pollutant Discharge Elimination System ("NPDES") permits. *Delaware County Safe Drinking Water Coalition, Inc. v.*

---

[2] "The purpose of the public comment period is to allow interested individuals the opportunity to communicate information, concerns, and criticisms to EPA during the rule-making process." *American Farm Bureau Federation v. U.S. E.P.A.*, 11-CV-0067, 2013 WL 5177530, (Sept. 13, 2013) (citing *Conn. Light & Power Co. v. NRC*, 673 F.2d 525, 530 (D.C.Cir. 1982)).

*McGinty*, 07-CV-1782, 2007 WL 2213516, *6 (E.D.Pa. July 31, 2007).

The Department of Environmental Protection uses narrative criteria to regulate nutrients in Pennsylvania waterways. 25 Pa. Code §93.6(a) ("Water may not contain substances attributable to point or nonpoint source discharges in concentration or amounts sufficient to be inimical or harmful to the water uses to be protected or to human, animal, plant or aquatic life."). In sum, these criterion prohibit nutrient levels that are harmful to the specific water body in question but do not set a numerical cap on different levels of nutrients. Based on this narrative criteria, "a Pennsylvania waterbody is impaired by nutrients when excessive plant or algal growth causes a decrease in [dissolved oxygen] such that the [dissolved oxygen] level goes below the required amount necessary to support the designated use of that waterbody." (Doc. No. 1, at 9; *see also Implementation Guidance for Section 95.9 Phosphorous Discharges to Free Flowing Streams*, PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL PROTECTION (Oct. 27, 1997), http://www.elibrary.dep.state.pa.us/dsweb/ Get/Document-48364/391-2000-018.pdf.) As such, "the DEP's 303(d) listing methodology (the standard by which DEP determines whether a stream is nutrient impaired) specifically requires nutrients to be causing excessive plant growth and/or violations in the dissolved oxygen standard." (Doc. No. 1, at 10.)

In 2004, the Pennsylvania DEP identified Indian Creek as nutrient impaired. (Doc. No. 1, at 8.) On June 30, 2008, EPA Region 3 issued the Indian Creek TMDL "to address segments in the Indian Creek watershed listed on the state's 303(d) list[3] as not meeting aquatic life uses and impaired by siltation (sediments) and nutrients." (Doc. No. 1, at 8.) In response, plaintiff filed the present

---

[3]As alluded to previously, the §303(d) list itemizes waterways that do not meet the state's WQSs and are therefore deemed "impaired" under §303 of the Clean Water Act, which corresponds to 33 U.S.C. §1313(d)(1)(A).

complaint on November 11, 2012, alleging that the EPA's TMDL violated the Clean Water Act and the Administrative Procedures Act. More specifically, Count I of the complaint alleges that the EPA violated §303 of the CWA by failing to follow proper administrative procedures when it revised the Indian Creek WQS. (Doc. No. 1, at 14-15.) In Count II, plaintiff alleges that the EPA exceeded its statutory authority by creating a TMDL which was not based on the WQS created by the state of Pennsylvania, thereby violating 40 C.F.R. §122.44(d), 40 C.F.R. §130.7, and 25 Pa. Code §96.4(e)(1). (Doc. No. 1, at 16.) In Count III, plaintiff alleges that the EPA's TMDL was arbitrary, capricious, and an abuse of discretion in violation of 5 U.S.C. §706(2)(A) because it was based on nutrient levels when there was no evidence establishing a causal link between nutrient levels and Indian Creek's impairment. (Doc. No. 1, at 17-18.) Finally, in Count IV plaintiff claims that the EPA acted arbitrarily, capriciously, and abused its discretion in violation of 5 U.S.C. §706(2)(A) by disregarding new data and the recommendations of the EPA's Science Advisory Board when it denied plaintiff's motion for reconsideration. (Doc. No. 1, at 18-19.)

## STANDARD OF REVIEW

In deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation and citation omitted). After the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

6

inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). This standard, which applies to all civil cases, "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678; *accord Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) ("All civil complaints must contain more than an unadorned, the-defendant-unlawfully-harmed-me accusation.") (internal quotation omitted).

## DISCUSSION

**Count I: 33 U.S.C. §1365(a)(2)**

Plaintiff brings Count I of the complaint pursuant to 33 U.S.C. §1365(a)(2), which provides, "Except as provided in subsection (b) of this section and section 1319(g)(6) of this title, any citizen may commence a civil action on his own behalf . . . against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator." 33 U.S.C. §1365(a)(2). This statute provides only one remedy: "an order requiring the EPA to perform such nondiscretionary act or duty." *Delaware County Safe Drinking Water Coalition, Inc. v. McGinty*, 07-CV-1782, 2007 WL 4225580, *2 (E.D.Pa. Nov. 27, 2007) (quoting 33 U.S.C. §1365(a)(2)); *Kerns v. Dukes*, 153 F.3d 96, 112 (3d Cir. 1998). As such, in order to bring a claim under §1365, the claim must concern a mandatory duty, i.e. an action which the EPA may not choose to forgo. *Delaware County Safe Drinking Water Coalition, Inc. v. Hanger*, 304 Fed. App'x 961, 964 (3d Cir. 2008); *U.S. v. Sensient Colors, Inc.*, 07-CV-1275, 2009 WL 394317, *5 (D.N.J. Feb. 13, 2009) ("While a court may, under a statute's citizen suit provision, hold a defendant responsible for nonfeasance of a nondiscretionary duty, the citizen suit provision does not allow for a judgment of malfeasance, such as a finding that a defendant made the wrong decision."). To determine whether a statute imposes a mandatory duty, courts have looked at the plain meaning of

7

the statutory language to see if it contains imperative language such as "shall." *Raymond Proffitt Foundation v. U.S. E.P.A.*, 930 F.Supp. 1088, 1097-98 (E.D.Pa. 1996) (finding that use of word "shall" imposed mandatory duty on EPA); *United States v. Monsanto*, 491 U.S. 600, 607 (1987) (addressing whether forfeiture clause was mandatory and reasoning that use of word "shall" indicates Congress's intent to require forfeiture); *but see Harmon Cove Condominium Ass'n, Inc. v. Marsh*, 815 F.2d 949 (3d Cir. 1987) (finding "shall" used in conjunction with "whenever" gave EPA discretion concerning when and if to act); *Delaware Riverkeeper Network v. U.S. E.P.A.*, 11-CV-4302, 2012 WL 1535208 (D.N.J. 2012) (same).

In their motion to dismiss Count I of the complaint, defendants argue that plaintiff has failed to point to a mandatory duty that defendants failed to perform, thereby necessitating dismissal of the §1365(a)(2) claim. (Doc. No. 12.) In response, plaintiff argues that it did allege that defendants failed to perform a mandatory duty:

> 70. Specifically, the CWA provides the states with authority to establish and revise WQSs. *EPA may only revise a state's WQS after it has formally determined that a state's standard is inconsistent with the CWA, provided an opportunity for the state to revise its deficient standard, and given the public formal notice and the opportunity to comment on the revised standard*.
>
> 71. In issuing the Indian Creek TMDL, rather than follow Pennsylvania's narrative criteria for nutrients, and the published methodology for interpreting that criteria, *EPA developed its own standard and implementing interpretation*. Specifically, the Indian Creek nutrient TMDL was based expressly on macroinvertebrates; it was not based on plant growth or dissolved oxygen, as required by Pennsylvania law.
>
> 72. In directing its TMDL consultants to presume, rather than demonstrate that nutrients are causing macroinvertebrate impairments to Indian Creek, *EPA modified the causation requirement of the state's narrative standard*.
>
> 73. In creating specific numeric thresholds in the Indian Creek TMDL *and other Pennsylvania TMDLs* for identifying the level by which Pennsylvania waterbodies will be deemed nutrient impaired, *EPA revised the state's*

8

> *narrative standard for nutrients*.

> 74. In doing so, *EPA effectively altered Pennsylvania's WQS for nutrients without following the appropriate procedures*, and therefore violated its mandatory duty for federal revision of a state WQS. (Doc. No. 1, at 15.)

A cursory review of these allegations indicates that Count I challenges the procedures that the EPA used to revise the state's WQS, a challenge that is, as defendants point out, properly brought under the Administrative Procedure Act, not §1365. *See* Administrative Procedures Act, 5 U.S.C. §706(2)(D) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law."); *U.S. v. Sensient Colors, Inc.*, 07-CV-1275, 2009 WL 394317, *5 (D.N.J. Feb. 13, 2009) (distinguishing between failure to perform mandatory duty and erroneous performance of a duty). Plaintiff has simply failed to articulate a nondiscretionary duty that the EPA failed to perform. Therefore, the court will **GRANT** the motion to dismiss Count I of the complaint. Furthermore, because leave to amend would be futile in this case, the court will **DISMISS** Count I **WITH PREJUDICE**.

**Count IV: 5 U.S.C. §706(2)(A)**

Plaintiff brings Count IV under 5 U.S.C. §706(2)(A), a statute outlining the scope of judicial review of agency decisions that provides, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . ." 5 U.S.C. §706(2)(A). Judicial review of an agency decision is appropriate only when a final decision has been made by the agency. *Id.* An agency decision is final if it marks the "consummation of the agency's decisionmaking process" and the agency's disposition of the matter is one in which "rights or obligations have been determined or from which legal consequences will flow." *Minard Run Oil Co. v. U.S. Forest Service*, 670 F.3d 236,

247 (3d Cir. 2011) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

Defendants move to dismiss Count IV on the ground that there has been no final agency action and therefore the claim is not yet ripe for review. (Doc. No. 12, at 11.) More specifically, defendants point out that plaintiff sought reconsideration of the EPA's initial decision and that the agency has not yet completed its review of plaintiff's request. (Doc. No. 12, at 11.) Furthermore, even if the EPA had already issued a decision regarding the request for reconsideration, defendants contend, a letter dated October 5, 2010, indicates that the matter was elevated to EPA headquarters for further review. (Doc. No. 12, at 11-12.) In response, plaintiff points to several enigmatic sentences in Exhibit C of the complaint and a letter from the EPA to plaintiff's counsel as evidence that there has been a final decision. Furthermore, after the present motion to dismiss had been fully briefed, plaintiff submitted further evidence in the form of a privilege log provided in response to plaintiff's FIOA request. Defendants acknowledge the veracity of these documents but question the inferences that plaintiff draws from them, particularly that they support the conclusion that there has been a final agency decision.

"Ripeness is a justiciability doctrine intended to prevent a court from entangling itself in abstract disagreements by avoiding premature adjudication." *Save Ardmore Coalition v. Lower Merion Township*, 419 F.Supp.2d 663, 669 (E.D.Pa. 2005). An appeal from an agency decision is subject to dismissal under Rule 12(b)(1) of the Federal Rules for lack of ripeness if there has been no final decision. *Id*. In moving for dismissal under Rule 12(b)(1), a party can make a facial attack or factual attack. *Id.* at 669. A facial attack merely challenges the face of the pleadings and, therefore, the party's failure to allege sufficient grounds to establish subject matter jurisdiction. *Id.* "In a factual attack, the defendant challenges the court's jurisdiction on evidence outside the pleadings and the

court may review and rely upon any evidence in assessing jurisdiction." *Id.* Nevertheless, the plaintiff bears the burden of establishing the existence of subject matter jurisdiction by a preponderance of the evidence. *Id.* In this case, defendants have mounted a factual attack because defendant relies on documents extrinsic to the complaint. (Doc. No. 12, at 11-12.)

Plaintiff relies on the exhibits submitted with the complaint as well as supplemental documents filed after the parties had fully briefed the motion to dismiss to argue that this court has jurisdiction over the matter. First, plaintiff relies on the following statement from the EPA to plaintiff's counsel: "If after the peer review concludes, you, your clients, or the Commonwealth of Pennsylvania believe that certain findings or conclusions of the peer review suggest that the TMDLs or their endpoints need to be revisited, we will consider that issue when the new information becomes available and there has been an opportunity to review and evaluate it." (Doc. No. 14, Ex. A.) Furthermore, plaintiff argues that defendant EPA admits in its answer to the complaint "that the appropriate body received and reviewed documents and data submitted by Plaintiff in 2010." (Doc. No. 14, at 11.) Finally, plaintiff points to an e-mail from Christopher Day of the EPA stating, "We propose an agenda that would include EPA's short summary of our view of the SAB report and also a status of the nutrient TMDLs." (Doc. No. 14, Exh. B.) These statements, while perhaps marginally probative of the issue, hardly conclude the question of whether there has been a final agency action regarding plaintiff's reconsideration. In fact, most of them are just as indicative of ongoing agency consideration as they are of a final agency decision.

Plaintiff does, however, cite some probative evidence. For instance, an e-mail dated June 29, 2010 reads, "EPA (Ephraim King) had informed us previously that EPA would explain how it would proceed on the TMDLs (withdrawal, modification, no change, etc.) once the SAB review was final.

11

We expect to receive that answer in the meeting, unless the Agency wishes to provide it to us in writing." (Doc. No. 14, Exh. B.) In what appears to be a response e-mail, an EPA employee states, "EPA is prepared to discuss our views on the results of the SAB report and our view on the status of the nutrient TMDLs." (Doc. No. 14, Exh. B.) Plaintiff also points to letter from its own counsel as well as plaintiff's FIOA request in which it requested the basis for the EPA's final decision on the matter, arguing that plaintiff would not have inquired about the agency's decision if it had not yet issued one. (Doc. No. 14, Ex. E & F.)[4] Finally, Mark David, manager for the Telford Borough Authority, submitted an affidavit in which he states:

> 4. During this July 8, 2010, meeting, Mr. Jon Capacasa, the EPA Region III official who signed the Indian and Goose Creek TMDLs, read from a prepared statement indicating that (1) both Indian Creek and Goose Creek had been properly identified as nutrient impaired, (2) the Science Advisory Board's recent peer review supported the methodology used in the Indian and Goose Creek TMDLs, and (3) in light of these findings, neither the Indian or

---

[4]Plaintiff's letter, dated July 30, 2010, states in part:

Based on the meeting discussion, it is apparent that EPA rejected all of the new information. Thus, we remain at an impasse on virtually all matters of substance, though the open dialogue resulted in a productive exchange of information. . . .

Although a written response to the group's TMDL withdrawal request was not provided, during the course of the meeting the Region made several things clear. First despite all the new information provided to the Region in a February letter and the recently finalized the [sic] Scientific Advisory Board ("SAB") report, the Region asserted that the TMDLs are scientifically defensible. . . .

Other excerpts from the letter, however, dispel the notion that this letter is indicative of a final agency decision. The letter continues:

In light of the closing discussion, our group remains hopeful that a resolution can be reached on the Goose, Indian, and Paxton Creek TMDLs. However, the group is prepared to pursue alternative options in the event that such an agreement is not forthcoming shortly. . . . As a result, we will ask for an independent review of the matter by the Administrator's office.

Goose Creek TMDLs would be withdrawn. (Doc. No. 14, Exh. C.)

Plaintiff also points to a document called the "Vaughn Index,"[5] a privilege log which lists a number of privileged documents along with a brief description of their contents. (Doc. No. 25, Attach. 1.) This log was produced in response to a FIOA request in which plaintiff sought information concerning the status of its reconsideration request. (Doc. No. 25, Attach. 1.) Plaintiff argues that several entries in this log demonstrate that the EPA has issued a final decision. (Doc. No. 25.) The privilege log, contrary to plaintiff's assertions, simply provides nothing of substantial value in determining whether there has been final agency action. For instance, plaintiff states, "EPA identified the 'Talking Points' that were used to deny Telford's reconsideration request at the July 8, 2010, meeting," (Doc. No. 25, at 2), but the only document listed on the privilege log that is dated July 8 and it titled "Talking Points" rather prominently describes the document as "Meeting Preparation Notes," not an official record of the meeting. (Doc. No. 25, Attach. 1.) Plaintiff also points to an October 14 document, but this document is described as "Memo" and titled "James Curtin. Responses to John Hall's Documentation Submitted to Nancy Stoner." (Doc. No. 25, Attach. 1.) The other privilege log entries suffer from the same defect in that they are barely, if at all, probative of final agency action: a November 16 document titled "Summary of PA Nutrient TMDLs" and labeled "draft memo," a 2011 document titled "Technical Direction for Evaluation of Nutrient TMDL P Endpoint in Light of SAB Peer Review, EPA" and labeled "memorandum," a document titled "PA TP TMDL Revision Update" and labeled "presentation," and a document titled "Email from Larry Merrill, EPA to Ephraim King on Region III summary on PA nutrient TMDLs in

---

[5]The "Vaughn Index" was submitted to plaintiffs in response to the earlier-mentioned FOIA request.

response to Hall letter with attachments (Region III Summary - PA Nutrient TMDLs and PA Nutrient TMDLs Listing Appendix" and labeled "email and attachments." (Doc. No. 25, Attach. 1.)

In light of the inconclusive nature of the evidence, when viewed as a whole, the court does not believe that plaintiff has met his burden of proof on the issue of jurisdiction. Most, if not all, of plaintiff's evidence is just as demonstrative of ongoing agency consideration as it is of a final agency action, and none of the evidence establishes by a preponderance of the evidence that the agency made a final decision. This conclusion is all the more compelling given that plaintiff has failed to provide the court with any formal documentation evidencing a final decision. All of the documents plaintiff produces in support of its contention appear to be informal communications, either from plaintiff to agency employees or from agency employees to counsel. As defendants point out, there is a clear distinction between informal communications of an agency and its personnel and formal agency action. *See Holistic Candlers & Consumers Ass'n v. Food & Drug Admin.*, 664 F.3d 940, 945-56 (D.C. Cir. 2012) (finding that "a statement or advice given by an FDA employee orally is an informal communication that does not necessarily represent the formal position of FDA, and does not bind or otherwise obligate or commit the agency to the views expressed"). Informal communications are simply not as probative of final agency action as plaintiff would like them to be. As such, plaintiff has failed to meet its burden. However, because the parties sharply dispute the matter, the court will **GRANT** the parties **LEAVE TO ENGAGE IN LIMITED DISCOVERY** on the matter of subject matter jurisdiction. Discovery on this matter shall be completed on or before January 15, 2014.

## CONCLUSION

In light of the foregoing discussion, defendants' motion to dismiss will be **GRANTED IN PART** and **DENIED IN PART**. The motion to dismiss Count I of the complaint will be

**GRANTED**. Count I of the complaint will be **DISMISSED WITH PREJUDICE**. Furthermore, the motion to dismiss Count IV of the complaint will be **DENIED WITHOUT PREJUDICE**. The court will **GRANT** the parties **LEAVE TO ENGAGE IN LIMITED DISCOVERY** on the matter of subject matter jurisdiction. Discovery on this matter shall be completed on or before January 15, 2014.

                                                **BY THE COURT:**

                                                 /s/ C. Darnell Jones, II
                                                 **C. DARNELL JONES II, J.**