**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TELFORD BOROUGH AUTHORITY,** | : | |
| *Plaintiff,* | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | **NO. 12-6548** |
| | : | |
| **UNITED STATES ENVIRONMENTAL** | : | |
| **PROTECTION AGENCY,** *et al.*, | : | |
| *Defendants.* | : | |

<u>**MEMORANDUM OPINION**</u>

**Goldberg, J.**                                                                                    **April 27, 2023**

In 2008, the Environmental Protection Agency ("EPA") issued a plan for managing pollutants in the Indian Creek Watershed located in Southeastern Pennsylvania, which addressed parts of the creek that were impaired by sediment and nutrients, with a particular focus on phosphorus levels.  Plaintiff, the Telford Borough Authority ("Telford"), has continually raised concerns about the methodology utilized to create this plan.  Telford objected to the plan multiple times, including requesting peer review, suggesting cost-effective alternative plans, and seeking a meeting with EPA administrators.  After the EPA rebuffed all of Telford's requests, Telford sued seeking judicial review of those agency actions, arguing they were arbitrary and capricious.  Telford additionally asserts that the plan itself was established in violation of several federal statutes, and that the EPA violated its due process rights by demonstrating a pattern of bias throughout the regulatory process.

Telford filed its original complaint in November of 2012, but the case was stayed for several years while the parties engaged in settlement discussions.  It was returned to active status in July of 2019, and thereafter reassigned to my docket in December of 2022.  As detailed below, on February 9, 2021, Telford filed an Amended Complaint.  Currently pending before me is a

Partial Motion to Dismiss numerous counts in the Amended Complaint filed by the EPA, "EPA, Region 3," Lisa Jackson, the Administrator of the EPA, and Shawn Garvin, the Regional Administrator of the EPA, Region 3, (collectively, "the EPA").  For the reasons that follow, the EPA's Motion will be granted in part and denied in part.

## I.    FACTUAL BACKGROUND

The Federal Water Pollution Control Act ("Clean Water Act" or "CWA") is a federal statute designed to help restore and maintain water quality.  The CWA requires states to establish water quality standards, which are determined based on the particular water area's designated uses. States must review and modify their water quality standards every three years, and such standards are then subject to approval by the EPA.  When a water body does not meet these standards, it is deemed "impaired," pursuant to § 303(d) of the CWA.  (Am. Compl. ¶ 23, 25–26, 33.)

When a water body is deemed impaired, the EPA performs an evaluation as to whether a "total maximum daily load" (TMDL) must be established. (Id. ¶ 36.)  A TMDL specifies the amount of a pollutant that can permissibly contaminate a water body per day without impairing its use. (Id. ¶ 42.)  Put another way, a TMDL is essentially a "pollutant budget" for a body of water. (Def. Mot. p. 5).  It functions as a planning document that calculates the total amount of a particular pollutant that a body of water can receive on a daily basis and allocates that total amount to the various sources of the pollutant.  (Am. Compl. ¶ 42.)  Using this budget, regulators can coordinate their responses to pollution to ensure that water quality standards are met. (Def. Mot. p. 6).

The following facts are taken from Telford's Amended Complaint.  When deciding a motion to dismiss for failure to state a claim, I must assume the veracity of all well-pleaded facts found in the complaint.  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).

**A.  The 2008 Indian Creek TMDL**

On June 30, 2008, the entity responsible for administering and implementing the CWA in Pennsylvania, EPA Region 3, issued a TMDL for the Indian Creek Watershed, intending to address parts of the creek that were impaired by sediment and nutrients, with a particular focus on the total levels of phosphorus in the water. (Am. Compl. ¶ 49.)[1]  These nutrients were believed to affect Indian Creek's macroinvertebrate aquatic life.  The Indian Creek TMDL instream total phosphorus nutrient endpoint was developed for EPA Region 3 based on a document titled *Development of Nutrient Endpoints for the Northern Piedmont Ecoregion of Pennsylvania: TMDL Application*, prepared for EPA Region 3 by Tetra Tech, a consulting firm, on November 20, 2007 (the "2007 Nutrient Endpoint Report")  When the 2007 Nutrient Endpoint Report was released to the public, Telford and others in the scientific community raised several objections to the methodology relied upon in the report. (Id. ¶¶ 51, 54, 55-103.)

Based on requests from the regulated community, including Telford, the EPA convened its Scientific Advisory Board ("SAB")[2] to evaluate the nutrient methodology used in the Indian Creek TMDL and other Pennsylvania nutrient TMDLs to identify nutrient endpoints.  On April 27, 2010, the SAB's report concluded that the EPA's recommended approach to nutrient criteria identification (the methodology used in the 2007 Nutrient Endpoint Report) needed "substantial revision." Specifically, the SAB found that the EPA's methodology did not demonstrate, but simply presumed, a cause-and-effect relationship between nutrient concentrations and invertebrate populations.  It further concluded that other factors, including the amount of tree canopy, could affect invertebrate populations, and those other factors must be evaluated before making a

---

[1]     Indian Creek was identified as nutrient impaired in 2004 by the Pennsylvania Department of Environmental Protection.  (Am. Compl. ¶ 50.)
[2]     The SAB is a public advisory group that provides scientific information and advice to the Administrator and other EPA officials.  (Am. Compl. ¶ 105.)

conclusion that a causative link exists between the presence of nutrients, like phosphorus, and reduced invertebrate metrics. (Id. ¶¶ 104–105, 109, 110.)

### B.  The 2012 Nutrient Endpoint Report

In response to the SAB's critique, in 2012, Tetra Tech developed a report entitled *Development of Nutrient Endpoints for the Northern Piedmont Ecoregion of Pennsylvania: TMDL Application – Follow-Up Analysis* ("2012 Nutrient Endpoint Report") for EPA Region 3.  This report contained new analysis to support the same 40 µg/L "total phosphorus" ("TP") nutrient endpoint previously selected in the 2008 TMDL.  Thus, the 2012 Nutrient Endpoint Report supported the continued use of the same TP endpoint of 40 µg/L.  This report applies to all of Southeastern Pennsylvania.  (Id. ¶¶ 114-118.)   The EPA Region 3 subsequently relied on the 2012 Nutrient Endpoint Report as the technical basis for concluding that the 40 µg/L nutrient endpoint for phosphorus should be used in the Indian Creek TMDL.

Telford alleges that reducing the concentration of phosphorus in the water to that level would cost hundreds of millions of dollars in compliance costs for Southeastern Pennsylvania communities.  Telford further claims that the 2012 Nutrient Endpoint Report was not subject to independent peer review or a notice and comment period, and that all endpoints within the 2012 Nutrient Endpoint Report are based on data that are not from Indian Creek.  And Telford stresses that Tetra Tech was apparently told by the EPA to assume that the systems are nutrient impaired. For these reasons, among others, Telford asserts that the accuracy of the 2012 Nutrient Endpoint Report should, at minimum, be questioned.  (Id. ¶¶ 119, 121, 125-56.)

### C.  Telford's Requests for Peer Review of the 2012 Nutrient Endpoint Report

The EPA utilizes peer review to ensure the accuracy of technical documents with wide regulatory impact.  For example, the EPA has conducted independent peer review of other

technical reports used to help develop nutrient TMDLs.  According to Telford, the EPA peer review guidance indicates that situations involving high costs or scientific controversy supports the undertaking of peer review.  (Id. ¶¶ 157–158, 160.)

On June 6, 2017, Telford, along with others, requested that the EPA conduct an independent peer review of the 2012 Nutrient Endpoint Report because Telford had concerns about its accuracy.  Telford noted the following flaws in the report: (1) data confirm that high levels of plant growth are occurring independent of TP concentrations; (2) data confirm that increasing canopy cover would be far more effective than phosphorus reduction to control plant growth; (3) scientific studies confirm that periphyton control via TP reduction is virtually impossible; (4) the background concentrations of TP for Indian Creek are higher than the 40 µg/L target and would make compliance infeasible; and (5) the 2012 Nutrient Endpoint Report is still at odds with the earlier SAB review findings regarding the development of nutrient endpoints.  On August 24, 2017, the EPA denied Telford's peer review request, stating that, "[a]dditional peer review would be repetitive and consequently not an efficient use of Agency resources." (Id. ¶¶ 162–65; Ex. C.)

Following this denial, on January 9, 2018, Telford submitted another request for independent peer review of the 2012 Nutrient Endpoint Report, which included a FOIA request for any documentation confirming that attaining the 40 µg/L TP restriction would cause a significant reduction in stream plant growth.  In November of 2018, the EPA again denied Telford's second request for peer review for the same reasons that the first request was denied. The EPA's letter did not address the FOIA request.  (Id. ¶ 169, 172, 174.)

### D.  Telford's Requests for Reconsideration of the Indian Creek TMDL

In addition to its requests for peer review, Telford has sought reconsideration of the Indian Creek TMDL via four (4) separate requests in 2009, 2010, 2014, and 2019.  On September 18,

2009, Telford submitted a request for withdrawal of the TMDL upon receipt of the SAB's summary findings that the TMDL relied on discredited approaches.  Telford's 2009 request informed the EPA that the SAB found that the 2007 Nutrient Endpoint Report: "(1) lacked any cause-and-effect relationship; (2) failed to consider confounding factors; (3) cannot develop scientifically defensible data without accounting for confounding factors; and (4) the use of the conditional probability method was inappropriate for criteria derivation."  According to Telford, the data presented to the EPA in the 2009 request confirmed that canopy restoration would be necessary to limit plant growth.  When Telford never heard from the EPA, it submitted a follow up letter on November 3, 2009, as a supplement to the request, which further advised of critical issues with the Indian Creek TMDL.  The EPA never responded to Telford's September 2009 request or the November 2009 supplement.  (Id. ¶¶ 175–77, 180–83.)

Again, in 2010, Telford and other stakeholders submitted a new request for reconsideration, including new information concerning the legal and technical sufficiency of the TMDL.  This request was submitted to EPA Region 3 on February 4, 2010, and to the EPA Headquarters on September 14, 2010.  In July of 2010, EPA Region 3 verbally rejected the request in a meeting with Telford's representatives, and the EPA Headquarters denied the request for reconsideration by written correspondence on October 15, 2010.  Three years later, on March 21, 2014, the EPA issued the final "Reconsideration Denial Decision and Rationale" for the Indian Creek TMDL.  The EPA did not engage in a public notice and comment period to address the new analysis the Reconsideration Denial was based upon.  (Id. ¶¶ 188-90, 192–93, 195.)

On December 23, 2014, after this final Reconsideration Denial, Telford submitted another TMDL reconsideration request based on a site-specific study conducted in Indian Creek.  This newly submitted information allegedly confirmed that: (1) wastewater plant phosphorus reductions

will be ineffective in addressing periphyton growth in Indian Creek; (2) data verifies that light limitations can effectively limit plant growth; (3) the background levels of phosphorus in Indian Creek are higher than Telford's current discharge; (4) the 40 µg/L instream phosphorus target is unachievable; and (5) the selected phosphorus target would not eliminate impairment in Indian Creek even if achieved.  On September 8, 2016, the EPA denied the 2014 reconsideration request because the "EPA determined the Indian Creek TMDL is based on sound science and reflects Agency policy for establishing nutrient TMDLs[,]" and the "EPA has not been presented with or reviewed any post-TMDL site-specific monitoring data or other evidence that would indicate that the waters are not impaired by excessive nutrients."  (Id. ¶¶ 242–43, 246; Ex. K.)

Telford's final reconsideration request was sent to EPA Region 3 in 2019 and presented new additional data to confirm that: (1) the TMDL will be completely ineffective in meeting instream phosphorus objections; (2) upstream phosphorus concentrations are higher than 40 µg/L; and (3) natural background phosphorus concentrations exceed 40 µg/L.  The EPA subsequently denied Telford's request to meet to discuss the 2019 reconsideration request, and EPA counsel has advised that the 2019 reconsideration request has been fully considered.[3]  (Id. ¶¶ 249, 255, 257.)

**E.  EPA Denies Request for Alternative Watershed Plan**

In 2010, Telford and other affected parties presented an Indian Creek Watershed Riparian Restoration Plan to the EPA as a cost-effective alternative to the nutrient TMDL.  And again, in 2018, Telford requested the EPA consider another alternative plan (the "Alternative Watershed Plan") to resolve the excessive plant growth impairment of Indian Creek through more cost-

---

[3]   However, on September 19, 2019, EPA's counsel filed a letter clarifying that the EPA has not made a final decision regarding the 2019 reconsideration request. Rather, the letter notes that "[t]he Agency expects it will be able to respond to the request by the end of the year." See EPA's Counsel's Sept. 19, 2019 Ltr. (ECF No. 146). To date, the EPA still alleges that they have not made a final determination regarding Telford's 2019 request for reconsideration.

effective control methods.  In November of 2018, the EPA denied the Alternative Watershed Plan, stating that it was inadequate for reducing the pollutants of concern and not designed to attain applicable water quality standards.  (Id. ¶ 266–68.)

### F.  Telford's Request for a Meeting with the EPA

On March 25, 2019, Telford requested a meeting with the Municipal Ombudsman and the Assistant Administrator for Water of the EPA to discuss the outstanding issues with and seek resolution of the Indian Creek TMDL.  More specifically, Telford sought to discuss the utilization of an alternative watershed approach in Indian Creek.  According to Telford, it is standard practice that when a government entity, like Telford, requests a meeting on new information and beliefs that are pertinent to a regulatory action, that request is granted.  The EPA allegedly denied Telford's request for a meeting.  (Id. ¶¶ 282–85.)

### G.  Telford's FOIA Request

On October 6, 2016, Telford submitted a FOIA request to EPA Headquarters ("2016 FOIA Request"), seeking the following:

- Field studies or other empirical data demonstrating that periphyton growth in a warm water stream is not expected to exceed 200 mg/m$^2$ chlorophyll 'a' when a growing season instream total phosphorus concentration of 40 μg/L is maintained; and
- Any field studies or other empirical data measuring the level of periphyton growth occurring in a warm water stream with growing season total phosphorus concentrations ranging 10-40 μg/L.

The EPA responded to the 2016 FOIA Request stating that, "[y]our request, as written, for documents that 'demonstrate' a particular position, is not a proper request for Agency records under FOIA. The Agency is not required to answer questions or prove or disprove contentions phrased as FOIA requests."  Nonetheless, the EPA provided Telford with two disks containing water quality data for each state and territory within the United States.  (Id. ¶¶ 293–95; Ex. O.)

Telford submitted an appeal on December 12, 2017 requesting the EPA reopen the 2016 FOIA Request.  On January 19, 2018, the EPA granted the appeal in a letter, reopening the 2016 FOIA request and remanding it to the Officer of Water for their clarification and modification. However, the EPA reiterated its position in the letter that the "Officer of Water correctly determined that your request failed to reasonably describe the requested records" because "a request for documents that 'demonstrate' is a question that the Agency is not required to respond to in the context of a FOIA request."  (Id. ¶¶ 298–300; Ex.'s P, Q.)

On February 22, 2018, Telford submitted a letter to the EPA clarifying its 2016 FOIA request, stating:

> This request seeks any and all records at EPA HQ or EPA Region III concerning:
>
> - Field studies or other final reports/published studies presenting empirical data used by EPA Region III to confirm that it was scientifically defensible to conclude that periphyton grown in an eastern warm water stream is not expected to exceed 200 $mg/m^2$ chlorophyll-a when a growing season instream total phosphorus concentration of 40 µg/L is maintained; and
> - Any field studies or other final reports/published studies in EPA's possession presenting empirical data showing the level of periphyton growth occurring in an eastern warm water stream with growing season total phosphorus concentrations ranging 10-40 µg/L, regardless of whether or not they were used to derive or support EPA Region III's TMDL conclusions.

Am. Compl. ¶ 301; Ex. R.

The EPA and Telford discussed the February 22, 2018 letter on a phone call in which the EPA expressed difficulty interpreting phrases such as "field study" and "final report" and requested Telford provide citations for the EPA claims addressed.  On March 8, 2018, Telford submitted a follow up letter to the EPA, supplying them with specific instances when the EPA approved TMDLs with the parameters discussed in the 2016 FOIA Request.  The letter further stated that Telford did not agree with the EPA's claim that some of the terms in the request were ambiguous and clarified that the request did not require EPA staff to engage in any technically

sophisticated analysis because it did not seek the creation of new datasets or analyses.  The EPA responded by sending Telford a letter requesting further clarification of the 2016 FOIA Request, reiterating its inability to define terms such as "field study" and stating that the request as worded would require complex, technically sophisticated analysis and the creation of new documents. Telford replied that the request was clearly worded.  The EPA issued its final response to the request on December 21, 2018, providing the Indian Creek TMDL full administrative record and "a list of studies that custodians were able to reasonably identify that may be responsive to the subject matter of your request."  (Id. ¶¶ 302–304, 307–09; Ex.'s S–V.)

On January 30, 2019, Telford submitted a second appeal of the 2016 request, which challenged: (1) the EPA's failure to properly process Telford's request; (2) the EPA's failure to release documents responsive to Telford's request; and (3) the EPA's claim that the request was improper and unclear.  The EPA denied the appeal, stating that "FOIA does not require [the] EPA to review the TMDL administrative record to determine which record(s) may answer your specific question about the TMDL."  Telford states that the EPA did not provide any specific data, analysis, or documents that confirm that a 40 µg/L TP instream concentration target will control periphyton growth in Southeastern warm water streams.  (Id. ¶¶ 311–14, 320; Ex.'s W, X.)

## II.    PROCEDURAL HISTORY

The procedural history of this case is extensive.  Telford first commenced this action on November 20, 2012 and the case was originally assigned to the Honorable C. Darnell Jones.  After a series of motions, including both motions to dismiss and discovery motions, the parties notified Judge Jones in May of 2015 that they were engaging in settlement discussions and requested a stay on future scheduling.  As a result, the case was placed in civil suspense on May 18, 2015.  (ECF No. 77.)  During this time, Telford submitted to the EPA the numerous reconsideration and meeting

requests, peer review requests, new information, and FOIA requests regarding the Indian Creek TMDL as described above. (See Mot. For Leave to File Am. Compl., ECF No. 143, p. 3.)

On March 6, 2019, the EPA filed a motion to return the case to active status because they had concluded that additional settlement discussions would be unproductive.  After a status conference, Judge Jones granted the EPA's motion and returned the case to active status in July of 2019.  (ECF No. 142.)

On August 23, 2019, Telford filed a motion for leave to file an amended complaint, which Judge Jones referred to United States Magistrate Judge Lynne A. Sitarski for resolution.  On February 6, 2020, Judge Sitarski granted in part and denied in part Telford's motion.  (ECF No. 155.)  In Judge Sitarski's Memorandum Opinion, she stated that "[b]oth parties continue to vigorously dispute the finality of the [agency] actions at issue. These claims are not so futile as to warrant denial, and the claims may benefit from further factual development…Telford should be given the opportunity to test the merits of these claims, the EPA may substantively defend against these claims in an appropriate manner at a later date."  (ECF No. 154, p. 10.)  Telford thus filed an Amended Complaint on February 9, 2021 (ECF No. 165) seeking the following relief:

1. Declare that EPA exceeded its jurisdictional authority under the CWA by developing and establishing the Indian Creek TMDL (Count One);
2. Declare that EPA acted in an arbitrary and capricious manner in establishing the Indian Creek TMDL (Count Two);
3. Declare that EPA acted in an arbitrary and capricious manner in denying the reconsideration requests (Counts Three-Five);
4. Declare that EPA acted in an arbitrary and capricious manner in denying the peer review requests (Counts Six-Seven);
5. Declare the Indian Creek TMDL to be void and of no effect (Counts Eight-Eleven);
6. Declare that EPA acted in violation of FOIA for refusing to release the responsive documents and charging unreasonable fees given the work performed (Count Twelve)
7. Declare that EPA acted in a biased manner in developing and establishing the Indian Creek TMDL (Count Thirteen);
8. Enjoin EPA from enforcing the 2008 Indian Creek TMDL.

9. Award Telford the costs of litigation, including reasonable attorneys' fees and costs and the costs of expert witnesses.
10. Order any other relief as the Court deems just and proper.

Am. Compl. p. 53.

Telford also requests that I enjoin the EPA from enforcing the 2008 Indian Creek TMDL. The EPA responded by filing a partial motion to dismiss Counts Five, Six, Seven, Eight, Nine and Thirteen of the Amended Complaint. (ECF No. 171.)  Judge Jones denied the EPA's motion without prejudice as premature and ordered forty-five (45) days of factual discovery regarding the finality issue.  Just three days before the limited discovery period was over, Telford filed a motion for an extension of time to complete discovery.  Judge Jones referred this motion to Judge Sitarski, which she denied.  Telford filed Objections to Judge Sitarski's Opinion denying the extension request and then filed a motion for summary judgment asking the Court to find summary judgment on Count Twelve of its Amended Complaint regarding the EPA's alleged violation of the Freedom of Information Act in processing Telford's 2016 FOIA request.  In a March 29, 2022 Order, Judge Jones affirmed Judge Sitarski's denial of the extension request and denied the motion for summary judgment as premature.

The EPA then filed the present Partial Motion to Dismiss on April 8, 2022.  In their motion, they argue that dismissal of six of Telford's thirteen total claims is appropriate for the following reasons: (1) Counts Six and Seven fail to identify a reviewable final agency action; (2) Counts Eight and Nine should be dismissed because the two statutes the Indian Creek TMDL allegedly violated do not apply to TMDLs; (3) Count Thirteen, a due process claim, fails to identify a protected interest of which Telford was deprived; and (4) Count Five is based on the EPA's denial of a request for reconsideration from 2019 but the EPA has not yet acted on this request.

On April 19, 2022, Telford submitted a Response in Opposition to the EPA's Motion ("Pl. Response") (ECF No. 217), asserting the following: (1) as to Counts Six and Seven, the denial of peer review requests constitutes a reviewable final agency action, or, alternatively, these issues would benefit from further factual development; (2) Counts Eight and Nine must survive because the establishment of the Indian Creek TMDL was in violation of two separate statutes that do in fact apply to the implementation of TMDLs; (3) Count Thirteen properly states a due process challenge based on a pattern and practice of agency bias; and (4) Count Five should survive because the EPA denied the 2019 request for reconsideration.

On April 26, 2022, the EPA sought leave to File a Reply Brief in Support of their Motion but because their proposed Reply failed to comply with Judge Jones's Policies and Procedures, the Court denied the motion without prejudice.  Shortly thereafter, on May 2, 2022, the EPA filed another Motion for Leave to File a Reply Brief, and two days later, Telford sought leave to file a Sur-Reply.  Judge Jones granted both motions, and the EPA's Reply ("Reply") (ECF No. 225) and Telford's Sur-Reply ("Sur-Reply") (ECF No. 222) were both filed on May 9, 2022.  This case was reassigned to my docket on December 2, 2022.

## III.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).  The United States Supreme Court has recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quotations omitted).  "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and "only a complaint that

states a plausible claim for relief survives a motion to dismiss."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.  Id.

The Court of Appeals has detailed a three-step process to determine whether a complaint meets the pleadings standard.  Bistrian v. Levi, 696 F.3d 352 (3d Cir. 2014).  First, the court outlines the elements a plaintiff must plead to state a claim for relief.  Id. at 365.  Next, the court must "peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth."  Id.  Finally, the court "look[s] for well-pled factual allegations, assume[s] their veracity, and then 'determine[s] whether they plausibly give rise to an entitlement to relief.'"  Id., quoting Iqbal, 556 U.S. at 679.  The last step is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  Id., quoting Iqbal, 556 U.S. at 679.

## IV.    DISCUSSION

### A.  Counts Six and Seven: Arbitrary or Capricious Denial of Peer Review

In Counts Six and Seven, Telford claims that the EPA violated Section 706 of the APA when it denied peer review requests of the 2012 Nutrient Endpoint Report because these denials were arbitrary, capricious, and an abuse of discretion.  The EPA presently moves for dismissal of these claims, arguing that the denial of a peer review request does not constitute an "agency action" or a "final agency action," and thus is not subject to judicial review.  (Def. Mot. p. 7-8.)  Telford

responds that dismissal of these claims is not warranted at this early juncture because further factual development is necessary for the Court to properly consider this issue.  (Pl. Resp. p. 5-7.)

"The APA 'embodies [a] basic presumption of judicial review to one suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" Not an LLC v. Bureau of Alcohol, Tobacco, Firearms, and Explosives, No. 22-cv-747, 2022 WL 2073340, at *5 (W.D. Pa. June 9, 2022) (quoting Abbott Lab'ys v. Gardner, 387 U.S. 136, 140 (1967)). However, this presumption is limited, and "[j]udicial review is not available under the APA where 'statutes preclude judicial review' or 'agency action is committed to agency discretion by law.'" Id. (quoting 5 U.S.C. § 701(a)). "If review is allowed, a court may 'compel agency action unlawfully withheld or unreasonably delayed' or 'hold unlawful and set aside agency action' that is determined to be 'arbitrary, capricious, an abuse of discretion,' or 'short of statutory rights.'" Am. Disabled for Attendant Programs Today v. U.S. Dept. of Hous. and Urban Dev., 170 F.3d 381, 383 (3d Cir. 2006) (quoting 5 U.S.C. § 702).

"[T]o state a claim under the APA, the challenged agency action must be a 'final agency action.'" Kelerchian v. Bureau of Alcohol Tobacco Firearms & Explosives, No. 20-cv-3065, 2021 WL 2910934, at *4 (3d Cir. July 12, 2021) (quoting Chehazeh v. Att'y Gen. of U.S., 666 F.3d 118, 125 n.11 (3d Cir. 2012)).  If an agency action is not final, it is not judicially reviewable.  Chehazeh, 666 F.3d at 125 n.11.  "As a general matter, two conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decision making process – it must not be of a merely tentative or interlocutory nature." Bennett v. Spear, 520 U.S. 154, 177-178 (1997) (quoting Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 113 (1948)).  "And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Bennett, 520 U.S. at 178 (quoting

Port of Boston Marine Terminal Ass'n. v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 71 (1970)).  "If the practical effect of the agency action is not a certain change in the legal obligations of a party, the action is non-final for purposes of review." Nat'l Ass'n of Home Builders v. Norton, 415 F.3d 8, 15 (D.C. Cir. 2005) (citing DRG Funding Corp. v. Sec'y of Housing and Urban Dev., 76 F.3d 1212, 1214 (D.C. Cir. 1996)).

The Third Circuit has advised that the following five (5) factors should be considered in determining whether an agency action is final:

> First, does the agency action represent the definitive position of the agency? Second, does the agency pronouncement have the status of law, so that immediate compliance is expected? Third, does the agency action have immediate impact on the daily operations of the plaintiff? Fourth, is the dispute over a pure question of law, without the need for factual development? Finally, will a pre-enforcement challenge speed enforcement of the relevant act?

Solar Turbines, Inc. v. Seif, 879 F.2d 1073, 1080 (3d Cir. 1989).

Here, I find that legal consequences do not flow from the EPA's denial of peer review, and thus, the denial of a request to conduct peer review does not constitute a final agency action. Effectively, Telford states that without the chance to conduct peer review, it cannot determine whether the EPA's 2012 Nutrient Endpoint Report is scientifically defensible.  (Pl. Resp. p. 15.) Telford posits that if this Report is found to be scientifically inadequate, then the Indian Creek TMDL could be revoked or revised in a way that it prefers.  This argument is unpersuasive because the connection between denying peer review and any change in Telford's legal obligations is too attenuated to establish that legal consequences directly flow from this decision.

Before the denial of peer review, the Indian Creek TMDL for phosphorus was 40 µg/L, and Telford was obligated to conform with this regulation.  After the denial of peer review, Telford was still required to conform with the Indian Creek TMDL.  Neither parties' rights nor obligations changed when Telford's request was denied.  In fact, it is unclear how the EPA's internal peer

review process could impose any obligations on Telford at all.  See Holistic Candlers & Consumers Ass'n v. FDA, 664 F.3d 940, 944 (D.C. Cir. 2012) (holding that legal consequences do not flow from "an FDA warning letter [because they do not] compel[ ] action by [either] the recipient [or] the agency.").  Moreover, even if the EPA granted Telford's request for peer review, peer review has no mandatory, legally binding effect on the EPA.[4]  See American Petroleum Institute v. E.P.A., 684 F.3d 1342, 1349 (D.C. Cir. 2012) ("No doubt the EPA believes peer review is important and it intended to impress that value upon its staff, but the agency did not bind itself to a judicially enforceable norm.").  And the House Conference Report for the statute that created the SAB, 42 U.S.C. § 4365, states:

> The Science Advisory Board is intended to be advisory only. The Administrator will still have the responsibility for making the decisions required of him by law. The reviews and comments of the Board are to be provided by the Administrator for his use. *The Board is not intended as a forum to be used by outside interests to criticize the workings of the Agency.*

H.R. Rep. No. 95-722, at 16 (1977) (emphasis added).  With this in mind, I disagree with Telford's contention that legal consequences flow from the denial of peer review.

   With respect to Telford's alternative argument that it should be provided with an opportunity to conduct discovery on this issue, I note that Judge Jones already afforded Telford

---

[4]      Though Telford cites to the EPA's Peer Review Handbook in support of the position that peer review is mandatory, the disclaimer at the beginning of the handbook expressly notes the following:

   This 4th edition of the *Peer Review Handbook* was developed by the [EPA]…to provide guidance to EPA staff and managers who are planning and conducting peer reviews…This 4th edition is a guidance manual and not a rule or regulation. Some topics in the Handbook refer to laws or EPA policies. In such cases, this Handbook provides recommendations for how those provisions can be implemented. The *Peer Review Handbook* does not replace existing laws or regulations, does not change or substitute for any legal requirement, and is not legally enforceable. This 4th edition does not create or confer any legal rights or impose any legally binding requirements on EPA or any party. The use of non-mandatory language such as "may," "can" or "should" in this *Peer Review Handbook* does not connote a requirement but does indicate EPA's strongly preferred approach to ensure the quality of peer reviews conducted or initiated by EPA.

EPA's Peer Review Handbook, attached to Reply as Exhibit B.

the opportunity to do so following his denial of a previous motion to dismiss in August of 2021 (ECF No. 181).  Despite having nearly a decade to begin preparing discovery requests, Telford failed to timely serve these requests, a determination that was first made by Judge Sitarski and then affirmed by Judge Jones.

Absent a showing of a clear effect the denial of peer review had on Telford's rights, it cannot be said that the EPA's denial of Telford's request for peer review was a final agency action. Providing Telford with more time to conduct discovery on the issue is not warranted.  Accordingly, the EPA's Motion as to Counts Six and Seven of Telford's Amended Complaint will be granted.

### B.   The Indian Creek TMDL's Alleged Violations 33 U.S.C. § 1377a and 40 C.F.R. § 122.44(d)

The APA authorizes courts to "set aside" agency action if it is "not in accordance with law." 5 U.S.C. § 706(2)(A).  Accordingly, Telford alleges that the establishment of the Indian Creek TMDL was not in accordance with the law because it violates § 519 of the Clean Water Act, codified at 33 U.S.C. § 1377a, (Count Eight) and does not ensure protection of the designated uses of narrative criteria attainment, in violation of 40 C.F.R. § 122.44(d) (Count Nine).  The EPA responds that neither of these provisions apply to the establishment of TMDLs, and in fact, the Clean Water Act was enacted nearly eleven (11) years after the 2008 Indian Creek TMDL was established.  (Def. Mot. p. 12.)  For the following reasons, I agree with the EPA as to both claims.

### 1.   Count Eight: Section 519 of the Clean Water Act does not apply to the establishment of TMDLs

Section 519 of the Clean Water Act states that "[t]he administrator shall promote the use of green infrastructure in, and coordinate the integration of green infrastructure into, permitting and enforcement under this chapter, planning efforts, research, technical assistance, and funding guidance of the Environmental Protection Agency." 33 U.S.C. § 1377a(a).  However, nowhere in

the Act does it state that the EPA is mandated to pursue "green infrastructure" in lieu of establishing TMDLs.  In fact, there is no mention of TMDLs in the statute at all.

Telford admits that Section 519 does not require the EPA to vacate the TMDL.  Rather, Telford argues that the language of Section 519 required the EPA to consider and integrate alternative ways to implement the TMDL via watershed improvements (green infrastructure).  (Pl. Resp. p. 24.)   Telford notes that the statute provides "EPA <u>shall</u> direct each regional office . . . to promote and integrate the use of green infrastructure within the region."  (Pl. Resp. p. 22.) (emphasis in original).  And Telford highlights that the EPA has repeatedly rejected its requests to implement a stream bank restoration program, which is a form of green infrastructure that Telford claims would eliminate the adverse impacts the total phosphorus level is alleged to be causing the Indian Creek.  Effectively, Telford now claims that the EPA violated Section 519 when it denied Telford's request to implement an alternative watershed restoration plan.

I conclude that the EPA did not violate Section 519 when it declined to implement the green infrastructure proposed by Telford.  Section 519 is silent on the EPA's obligation to pursue less costly green infrastructure in lieu of establishing a TMDL, and Telford fails to cite any mandatory or persuasive case law, secondary materials, or Congressional history in support of its claim that alternative methods of implementing the TMDL should have been considered.[5]  Absent

---

[5]      Even if Section 519 did relate to TMDLs, however, the EPA further argues that the Act could not apply to the Indian Creek TMDL because it was established nearly eleven years before the Act itself.  (Def. Mot. p. 15; Reply 7.)  Telford responds that this is irrelevant because the application of Section 519 to the Indian Creek TMDL relates to the implementation and not to the establishment of the TMDL.  (Pl. Resp. p. 24.)  However, as the EPA correctly notes, Section 519 of the Clean Water Act does not retroactively apply to the Indian Creek TMDL.  (Def. Mot. p. 15.)  "[C]ongressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result."  <u>Bowen v. Georgetown Univ. Hosp.</u>, 488 U.S. 204, 208 (1988).  Section 519 does not explicitly provide for retroactive application.  Even though there is a distinction between TMDL implementation and establishment, Telford fails to explain how this distinction defeats the general presumption against retroactive application of the federal statute or how it supports their claim generally.

any language in Section 519 specifically prohibiting the establishment of TMDL's, I cannot conclude that the TMDL is void under that statute.  Accordingly, the EPA's Motion as to Count Eight will be granted.

### 2. Count Nine: 40 C.F.R. § 122.44(d)'s Application to TMDLs

In Count Nine of their Amended Complaint, Telford asks that I set aside the Indian Creek TMDL because it was established in violation of an EPA regulation governing National Pollutant Discharge Elimination System ("NPDES") permits. 40 C.F.R. § 122.44(d).  Specifically, Telford asserts that Section 122.44(d) requires that TMDLs "select numeric water quality-based effluent limits that ensure narrative criteria attainment and fully protect the designated uses."  (Am. Compl. ¶ 381.)  According to Telford, the selected endpoint target for TP in the Indian Creek TMDL does not ensure narrative criteria attainment or protection of the designated uses, in violation of Section 122.44(d).  The EPA responds that Section 122.44(d) applies only to discharge permits, not TMDLs, and therefore it cannot be used as a basis for setting aside the Indian Creek TMDL.

Section 122.44, entitled "Establishing limitations, standards, and other permit conditions" sets out conditions that NPDES permits must meet.  An NPDES permit is issued by the EPA Administrator and allows for the "discharge of any pollutant." 33 U.S.C. § 1342(a)(1).  Under Section 122.44(d), an NPDES permit must include "any requirements in addition to or more stringent than promulgated effluent limitations guidelines…necessary to [a]chieve water quality standards established under section 303 of the [Clean Water Act], including State narrative criteria for water quality."  Section 303 applies to waters that have been designated as impaired—like the Indian Creek Watershed—and are therefore subject to more stringent or additional permitting requirements.  More specifically, "[w]hen developing water quality-based effluent limits…the permitting authority shall ensure that…[e]ffluent limits developed to protect a narrative water

quality criterion, a numeric water quality criterion, or both, are consistent with the assumptions and requirements of any available wasteload allocation for the discharge prepared by the State and approved by EPA pursuant to 40 C.F.R. 130.7." 40 C.F.R. § 122.44(d)(1)(vii)(B).  Section 130.7 details the process for identifying TMDLs.

The Indian Creek TMDL does not violate Section 122.44(d) because that regulation does not apply to the establishment of TMDLs.  Telford argues NPDES and TMDL actions must be consistent pursuant to 40 C.F.R. § 130.12(a), which provides that "[n]o NPDES permit may be issued which is in conflict with an approved Water Quality Management (WQM) plan."  Because a TMDL is a component of a water quality management plan, Telford argues that when a TMDL and an NPDES permit are inconsistent, the TMDL is in violation of 40 C.F.R. § 130.12(a).

Telford's argument fails for two reasons.  First, the Amended Complaint alleges a violation of Section 122.44(d), not Section 130.12(a).  Second, just because there is an inconsistency between an NPDES permit and a TMDL does not necessarily mean the TMDL is noncompliant.  Under Section 122.44(d), NPDES permits must be consistent with the TMDL requirements of 40 C.F.R. 130.7.  If the former is violated, then it would not be consistent with the latter.  However, an inconsistency between the provisions does not necessarily mean a TMDL, like the one at issue here, is non-compliant with 40 C.F.R. 130.7.  For these reasons, Telford fails to sufficiently allege that 40 C.F.R. § 122.44(d) applies to TDMLs.[6]  Accordingly, the EPA's Motion as to Count Nine will be granted.

---

[6]     Assuming I agree with the EPA that § 122.44(d) is inapplicable to the present action, Telford argues that Count Nine should still survive dismissal even if the references to 40 C.F.R. § 122.44(d) is struck from its Amended Complaint.  (Pl. Resp. p. 27.)  However, if an alleged violation of § 122.44(d) is struck from the Amended Complaint, Count Nine just alleges a general violation of 5 U.S.C. § 706(2), without any identification of what law the EPA violated. Such is insufficient to state a viable claim for relief and will not be considered further for purposes of the present motion.

### C. Count Thirteen: Due Process Claim

Count Thirteen of Telford's Amended Complaint alleges that the EPA violated Telford's due process rights by acting in a biased manner throughout the Indian Creek TMDL review process. (Am. Compl. ¶¶ 406-415.) Specifically, Telford claims the EPA acted in a biased manner by: 1) refusing to take into account all of the additional information, data, and analysis for reconsideration; 2) refusing to meet and resolve issues with Telford while engaging with other entities included in the Indian Creek TMDL; 3) directing its consultants to presume nutrients are impairing Indian Creek; 4) refusing to present any independent peer review of EPA's TMDL actions while granting similar requests in other TMDL matters; and 5) refusing to respond to FOIA requests. (Am. Compl. ¶¶ 409-414.) In their motion, the EPA argues that Telford's due process claim fails for two reasons: (1) Telford fails to identify a process or constitutionally protected interest of which they were deprived; and (2) Telford's allegation does not indicate any bias that could rise to the level of a due process violation. (Def. Mot. p. 18.)

"The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or liberty.'" Am Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 59 (1999); see U.S. Const. Am. 14 ("nor shall any state deprive any person of life, liberty, or property, without due process of law"). "Only after finding the deprivation of a protected interest do we look to see if the State's procedures comport with due process." Id. Due process requirements apply to both court and administrative adjudication. Withrow v. Larkin, 421 U.S. 35, 47 (1975). "[A] fair trial in a fair tribunal is a basic requirement of due process." In re Murchison, 349 U.S. 133, 136 (1955).

In order to properly plead a due process violation based on an institutional pattern of bias, a plaintiff must allege facts that present a "risk of unfairness [that] is intolerably high." Withrow,

421 U.S. at 58.  That is because "[a]gency administrators are presumed to be capable of judging a particular controversy fairly on the basis of its own circumstances."  Matter of Seidman, 37 F.3d 911, 924 (3d Cir. 1994) (internal quotations omitted).  The burden a plaintiff must meet to overcome this presumption of fairness is high, and the examples in which courts have found due process violations typically involve the presence of an actual conflict of interest or some other unique circumstances.  United Retail & Wholesale Emps. Teamsters Union Loc. No. 115 Pension Plan v. Yahn & Mc Donnell, Inc., 787 F.2d 128 (3d Cir. 1986), aff'd sub nom. Pension Ben. Guar. Corp. v. Yahn & McDonnell, Inc., 481 U.S. 735 (1987), abrogated on other grounds, Concrete Pipe & Prod. of California, Inc. v. Constr. Laborers Pension Tr. for S. California, 508 U.S. 602 (1993) (due process violation due to likelihood of bias where agency adjudicator had a fiduciary or fiscal stake in decision); Indep. Pub. Media of Philadelphia, Inc. v. Pennsylvania Pub. Television Network Comm'n, 808 F. Supp. 416 (E.D. Pa. 1992) (state television network commission not able to rule fairly on funding request from new station because multiple members of the commission were representatives from competing stations and had financial incentive to reject request).

Telford falls short of establishing that "a risk of unfairness that is intolerably high" existed throughout the TMDL review process.  Telford offers no facts to suggest that a likelihood of bias existed due to an actual or even theoretical conflict of interest.  And no facts have been alleged to suggest that any EPA decisionmakers had a pecuniary or financial interest in the outcome of the TMDL process, as often present in cases where a due process violation has been found.   Rather, Telford simply disagrees with the EPA's decisions to move forward with the TMDL and reject its alternative suggestions.  The Amended Complaint does not set forth sufficient facts to suggest this disagreement was due to any unfair bias on the part of the EPA decisionmakers involved.  In short,

Telford has not met its burden to overcome the presumption of agency administrator fairness, and its claim as currently pled fails.

Accordingly, the EPA's Motion as to Count Thirteen will be granted. However, Telford will be given leave to amend their claim if they can, in good faith, allege additional sufficient facts to support their claim that the EPA acted in a biased manner throughout the TMDL review process.

### D. Count Five: Denial of 2019 Reconsideration

In Count Five, Telford alleges that the EPA's denial of its request for reconsideration of the 2019 Indian Creek TMDL was arbitrary, capricious, and an abuse of discretion, and therefore a violation of Section 706 of the APA. As detailed in the factual background above, Telford sought reconsideration of the Indian Creek TMDL four separate times. The most recent request submitted in 2019 was based on new data that Telford believes confirmed several of its concerns about the TMDL's accuracy. When Telford requested to meet with the EPA to discuss the request, the EPA responded via letter declining the invitation to meet, stating that "we … believe the most appropriate path forward is to reinitiate active litigation." (Pl. Resp. p. 32–33.) Telford contends that because this letter was sent over three years ago, "any reasonable person would understand [that response] to be a denial of the relief and actions requested." (Id.) The EPA responds that Count Five should be dismissed because Telford does not specifically allege that the 2019 request for reconsideration was denied, rather, it alleges that the request to meet and discuss the reconsideration was denied. Therefore, the EPA contends that no final agency action has been taken on the 2019 reconsideration request. (Def. Mot. p. 23.)

It has been three years since Telford submitted the 2019 reconsideration request, and the EPA still has not taken formal action on it. Despite a letter from the EPA's counsel from September 19, 2019, stating that "[t]he Agency expects it will be able to respond to the request by

the end of the year," no such determination has been formally made. <u>See</u> EPA's Counsel's Sept. 19, 2019 Ltr.  Rather, when Telford asked to meet with the EPA about this request, the EPA denied the invitation.  Based on these facts, I find that Telford has plausibly alleged a denial of the 2019 request for reconsideration, and further factual development on this issue is necessary. Accordingly, the EPA's Motion as to Count Five will be denied.

## V.     CONCLUSION

For the reasons outlined above, the EPA's Motion for Partial Dismissal is denied in part and granted in part.  The Motion as to Count Five is denied, and the Motion as to Counts Six, Seven, Eight, Nine, and Thirteen is granted.   An appropriate Order follows.